Louis J. Hexter v. Commissioner. Ruby D. Hexter v. Commissioner.
Hexter v. Commissioner
Docket Nos. 22930, 22931.
United States Tax Court
1952 Tax Ct. Memo LEXIS 265; 11 T.C.M. (CCH) 337; T.C.M. (RIA) 52096; April 7, 1952
Sam G. Winstead, Esq., 505 Republic Bank Bldg., Dallas 1, Texas, for the petitioners. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The respondent determined deficiencies in income tax for the year 1945 as follows: Docket No.
Petitioner
Deficiency
22930
Louis J. Hexter
$2,284.69
22931
Ruby D. Hexter
2,284.69
These cases were consolidated for hearing. Louis J. Hexter will hereinafter be referred to as the petitioner. The question presented is whether gain from the sale of real estate constitutes ordinary gain or long-term capital gain. Three separate pieces of property are involved in three separate transactions. Findings of Fact Louis J. *266 Hexter and Ruby D. Hexter were husband and wife during 1945, and residents of Dallas County, Texas. They filed separate individual income tax returns on the community property basis for 1945 with the collector of internal revenue for the second district of Texas. In 1945 petitioner was primarily engaged in the title and abstract business. He also owned an interest in a small loan company; he was a partner in a firm which engaged in the business of subdividing and selling real property; he was a partner in another firm which held rental real property. He owned and operated a farm which he kept as his home; he also received income from rental property on this farm. In 1945 petitioner sold the last lot of some 136 lots in Greenway Terrace. Greenway Terrace was real property, acquired and developed by the petitioner in the preceding five years, and was held primarily for sale to customers in the ordinary course of petitioner's business. The sale of this last lot constituted a sale of property held primarily for sale to customers in the ordinary course of petitioner's business. On November 30, 1944, petitioner and M. Katz each acquired an undivided one-half interest in real property *267 (lots 11, 12 and 13, in Block 52) located at Madison and Jefferson Streets in Oak Cliff, Dallas, Texas. This property was improved with two small houses. The property and the houses were purchased for $65,000. In April, 1945, the west 30 feet of lot 13 was sold for $17,000. Later, in July, the east 20 feet of lot 13 and the west 15 feet of lot 12 were sold for a total of $21,000. Petitioner and Katz then held 35 feet of lot 12 and all of lot 11, or a total of 85 feet. One of the houses was sold in December, 1944, for $1,000, the second in February, 1945, for $2,000. Petitioner began negotiation in April, 1945, for the erection of a building on lots 11 and 12. About the same time a lease agreement was entered into for the rental of the proposed building. This agreement was contingent upon the completion of the building. Actual construction of the building began about the middle of October, 1945. Petitioner expended $9,517.50 as his share of the cost of the building and improvements on this property. On October 31, 1945, Katz bought petitioner's interest in the property. Petitioner's profit from all transactions involving these three lots and the houses was $8,040.33. This gain was *268 realized from the sale of property held primarily for sale to customers in the ordinary course of petitioner's business. In August, 1943, petitioner and two others, as a partnership, purchased approximately 30 acres of land on Cedar Springs Avenue in Dallas County, southwest of Love Field Airport. This property was divided into three sections: that part west of Cedar Springs Avenue, which contained approximately 2.5 acres; that part east of Cedar Springs Avenue, later named Carver Courts No. 3, which contained approximately 7.2 acres, and that third part east of Carver Courts No. 3, and known as Carver Courts No. 2, which contained approximately 16.9 acres. Shortly after the petitioner purchased this property he sold the City of Dallas 3.5 acres for a drainage ditch. At the time the property was acquired petitioner intended to divide the portion now known as Carver Courts No. 3 into suburban business sites and to hold this property as an investment. The remainder of the property known as Carver Courts No. 2 was bought with the intention of subdividing it into residential lots for public sale. In March, 1944, petitioner filed a plat for Carver Courts No. 2 with the County Clerk *269 of Dallas County. This property was zoned for residential sites and divided into 87 lots. A month later the petitioner and his partners began to sell these lots. Some of the sales were made through agents, and a total of 54 lots was sold. In September, 1944, petitioner filed a plat for Carver Courts No. 3 with the County Clerk of Dallas County. This property was zoned for business sites. If this area had been platted as residential property it would have been divided into 39 lots. The partnership did not sell or improve any of the property in Carver Courts No. 3. Early in 1945 the City of Dallas informed the partnership that the property in Carver Courts Nos. 2 and 3 would be required for an extension of the Love Airport. After some negotiation the city agreed to purchase this property for $58,900. The sales agreement was executed in May, 1945. The purchase price was for both parcels, including those 54 lots previously sold. It was contemplated that the partnership would reacquire these lots. The partnership was successful in the reacquisition of this property and the entire area of Carver Courts Nos. 2 and 3 was transferred to the city. Carver Courts No. 2 was real property *270 held by the partnership primarily fo sale to customers in the ordinary course of its trade or business. Of the gross sales price of $58,900, the reasonable amount allotted to the area known as Carver Courts No. 2 is $37,030. Carver Courts No. 3 was real property held by the partnership for investment purposes. The reasonable amount of the total purchase price of $58,900 allotted to the area known as Carver Courts No. 3 is $21,870. Opinion The issue involved is one of fact, and the burden is on the petitioners to show that the properties in question were not held primarily for sale to customers in the ordinary course of trade or business. Greene v. Commissioner, 141 Fed. (2d) 645; certiorari denied, 323 U.S. 717; Commissioner v. Boeing, 106 Fed. (2d) 305; certiorari denied, 308 U.S. 619. To facilitate the discussion of the question herein, we shall separately consider the gain derived from the sale of each of the following pieces of real property: (1) the lot in Greenway Terrace; (2) the property at Madison and Jefferson Streets, and (3) the property known as Carver Courts Nos. 2 and 3. Respondent contends that the gain derived *271 from the sale of these three pieces of property was ordinary income and therefore can not be treated as capital gain under section 117 (j), Internal Revenue Code. In his 1945 return petitioner reported his gain from the sale of the lot in Greenway Terrace as a long-term capital gain. The modicum of evidence concerning the sale of this lot fails to support petitioner's treatment of the gain. The record indicates that the lot was the sole remaining lot of some 136 lots in an area which was acquired and developed by the petitioner over a period of years. The fact that this gain was derived from the last lot sold does not in itself compel us to hold that it should be treated like a capital gain. Capital gain benefits are not available to the petitioner when he develops and markets real property by subdividing it into lots for sale. C. E. Mauldin, 16 T.C. 698; affd., 195 Fed. (2d) 714 (decided March 19, 1952); A. R. Calvelli, 43 B.T.A. 6. We shall now consider the gain from the three lots at Madison and Jefferson Streets. Petitioner contends that when he and Katz bought this property they intended to sell a part of it *272 and keep part for investment purposes. He further contends that he sold his investment interest in the property because of a personal disagreement with Katz, and that the gain from this property should be treated as a capital gain. These contentions are unsupported by the evidence. Petitioner's ledger sheet for the property at Madison and Jefferson Streets reveals that no attempt was made to allocate the original cost of the property to each of the lots. He treated all three lots as one piece of property. In this record of the receipts and disbursements for the property he debited the original purchase price and all disbursements including the expenditures for the building. He credited this single account with the receipts from the sale of the two houses, as well as the money received from the three separate sales of the land. The account balance, that is, the difference between the aggregate of the debits and credits, indicates that the petitioner's profit from all the transactions for this property resulted in a profit of $8,040.33. This is the profit from the three land sales and the two house sales and can not be attributed to any separate sale. Since, except as to time, we are *273 unable to distinguish the sales one from the other, and since no apportionment was made in the original purchase price, we find that these three lots were sold in the ordinary course of petitioner's business. See Regulations 111, section 29.22 (a)-11. Finally, we shall consider the third piece of property, known as Carver Courts No. 2 and No. 3. Petitioner reported the gain from the sale of Carver Courts No. 2 as ordinary gain; the gain from the sale of Carver Courts No. 3 as long-term capital gain. Respondent contends that the gain from the sale of both parcels was ordinary income. In an alternative contention respondent urges, if we hold that part of the sale is ordinary income and part is treated as long-term capital gain, that petitioner's apportionment of the gross sales price was improper. From the first subdivision platted in March, 1944, petitioner indicated an intention to sell lots in Carver Courts No. 2. Later, when the area of Carver Courts No. 3 was platted and rezoned for business purposes, petitioner indicated an intention to retain this area for investment purposes. Petitioner's intention is substantiated by the fact that there is some evidence of an apportionment *274 of the original cost to the separate parcels - Carver Courts No. and No. 3 and the area across Cedar Springs Avenue (not involved herein). Fifty-four lots were sold in a few months in Carver Courts No. 2. No individual sales were negotiated for property in Carver Courts No. 3. If this were the extent of the complexity of this case, the facts would lend themselves to a decision such as we made in Nelson A. Farry, 13 T.C. 8. However, there remains an additional fact. The City of Dallas, while extending the property of an airport, purchased Carver Courts No. 2 and No. 3 as a single parcel and for a single purchase price. The Code, in section 117 (j) (1), specifically excludes "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business"; therefore, petitioner may not consider the gain from Carver Courts No. 2 as a capital gain under this section. This is true whether the property was sold in many subdivided lots, or, as here, in one piece. However, we hold the gain from Carver Courts No. 3, the property held for investment purposes, to be a gain from the sale of a capital asset held for more than six months. The fact *275 that petitioner made a voluntary sale does not alter our holding. There is uncontradicted testimony that, if negotiations failed, the city would have acquired this area under the power of condemnation. Other property for the same airport had been acquired under this power. Since Carver Courts No. 3 was held for investment purposes for more than six months, and since the sale was made under the threat or imminence of condemnation, petitioner is entitled to the benefits of section 117 (j) (2) for the gain derived from the sale of this area. Decisions will be entered under Rule 50.